OPINION
By the Court,
Agosti, J.:
This is an appeal from an order of the district court denying a petition for termination of parental rights and from an order denying a motion for a new trial. In determining whether to terminate parental rights, this court has consistently applied the jurisdictional/dispositional standard set forth in Champagne v. Welfare Division, 100 Nev. 640, 691 P.2d 849 (1984). Based on legislative amendments to NRS 128.105, which sets forth the grounds for terminating parental rights, we now reject our Champagne standard, which requires a district court to find jurisdictional grounds to terminate parental rights before it considers the best interests of the child. In its place, we adopt a best interest/parental fault standard which requires a district court to consider whether the best interests of the child would be served by the termination and whether parental fault exists. We also conclude that the district court failed to apply the statutory presumption of abandonment as codified in NRS 128.012(2). In light of our decision today, we reverse the district court’s orders and remand this matter for a new trial.

FACTS

In 1988, a child was born to respondents Hikmet and Raja J. in Baghdad, Iraq. In early 1990, Raja and the child traveled from Iraq to Michigan, where family resides. That summer, Raja *793 departed from the United States and left the child behind in Michigan with her sister and brother-in-law, appellants Talia and Sam Z. Since then, Talia and Sam have raised the child in Las Vegas and San Diego. Talia and Sam are the only parents the child has ever known. Until recently, the child was unaware of the true identity of her biological parents.
In 1996, after caring for the child for approximately six years, Talia and Sam petitioned the Nevada district court for guardianship of the child. Talia and Sam’s petition was granted. Subsequently, Raja and Hikmet filed a petition to terminate the guardianship, which was denied. Thereafter, Talia and Sam sought to adopt the child. Accordingly, in May 1997, Talia and Sam moved the district court to terminate the parental rights of Raja and Hikmet. An evidentiary hearing was conducted on November 21, 1997.
During the hearing, the parties offered drastically differing evidence regarding the reasons why Talia and Sam have raised the child since 1990. Talia testified that following the news of Raja’s pregnancy with the child, a family member informed her that Raja was going to give the baby to her. According to Talia, Raja allegedly said that she wanted Talia to raise the child because Raja was too old and Talia was unable to conceive. Talia further testified that when Raja brought the child to the United States in 1990, Raja told Talia that the baby was now hers. Talia testified that she telephoned Hikmet, and he also told her to keep the baby.
Raja testified that she brought the child to Michigan in 1990 simply to visit family members. Raja further testified that her mother, the child’s grandmother, convinced her to leave the child in the United States so that Raja could join Hikmet at a medical conference in London, England.[1] Following the London conference, Raja and Hikmet returned to Iraq. According to Raja, she and Hikmet intended to retrieve the child in October 1990 when Hikmet was scheduled to attend a medical conference in Toronto, Canada. However, on August 2, 1990, Iraq invaded Kuwait. The allied forces began bombing Iraq on January 17, 1991. According to Raja and Hikmet, travel out of Iraq was restricted due to the conflict. Exactly when travel was restricted and for how long is unclear. The record indicates that in 1993, Raja traveled to Michigan to attend her older daughter’s wedding. In 1995, Raja returned to the United States to renew her green card. Allegedly, there was a ban on highly educated people leaving Iraq without special permission, and according to Raja and Hikmet, Hikmet was not allowed to leave Iraq until 1997. Talia and Sam insist that Hikmet traveled to Jordan in 1995.
*794 Siblings of Talia and Raja testified that the entire family discussed the fact that Raja intended to give the child to Talia. According to one family member, Raja said that she gave Talia her baby in order for Talia to have luck in having children of her own. This family member testified that, “[t]hat’s a superstition ... in our culture.”
Also during the evidentiary hearing, the parties presented conflicting evidence regarding two adoption consent forms allegedly executed by Raja and Hikmet. Raja admitted signing the first adoption consent form in Michigan on July 2, 1990, the day she left the United States for England. However, Raja testified that she did not read the document and thought it was an application to extend the child’s visa. Talia testified that Raja is fluent in English and knew that the document was an adoption consent form. Talia further testified that Hikmet signed this document in her presence when she traveled to Iraq in 1994.[2]
Raja and Hikmet admitted that they executed a second adoption consent form during December 1990 in Iraq. Raja and Hikmet further testified that they mailed this document with a will to Raja’s mother. Raja and Hikmet insist that a letter, enclosed with the documents, instructed Raja’s mother not to give the adoption consent form to Talia and Sam unless Raja and Hikmet and their three grown children died during the war. Raja reclaimed the adoption consent form from her mother in 1993, but apparently did not recover the letter or will.[3] Raja and Hikmet resided in Iraq until the beginning of 1997 when they immigrated to the United States.
During the seven years before Talia and Sam filed their petition to terminate Raja and Hikmet’s parental rights, Raja saw the child two times while visiting the United States, and Hikmet did not see the child at all. Talia testified that even though she telephoned Raja and Hikmet frequently, Raja and Hikmet showed no interest in communicating with the child; according to Talia they spoke to the child once by telephone when the child was four or five years old. Talia and Sam insist that Raja and Hikmet never provided any financial support for the child. Talia testified that Raja and Hikmet never sent the child presents or cards, except on one occasion when Raja and Hikmet allegedly sent a Christmas card addressed to the entire Z. family. The record establishes that immediately after Talia and Sam took custody of the child from *795 Raja and Hikmet, they changed the child’s name. Raja and Hikmet, and their three grown children, have since referred to the child by the new name.
Following the evidentiary hearing, the district court denied the petition to terminate Raja and Hikmet’s parental rights. The district court determined that the evidence presented did not establish by clear and convincing evidence jurisdictional grounds that Raja and Hikmet had abandoned the child. Thereafter, Talia and Sam timely filed a motion for a new trial. On May 14, 1998, the district court denied Talia and Sam’s motion. Talia and Sam timely filed this appeal.

DISCUSSION

Standard of review

Termination of parental rights is “an exercise of awesome power.” Smith v. Smith, 102 Nev. 263, 266, 720 P.2d 1219, 1220 (1986). Severance of the parent-child relationship is “tantamount to imposition of a civil death penalty.” Drury v. Lang, 105 Nev. 430, 433, 776 P.2d 843, 845 (1989). Accordingly, this court closely scrutinizes whether the district court properly preserved or terminated the parental rights at issue. See, e.g., Matter of Parental Rights as to Carron, 114 Nev. 370, 956 P.2d 785 (1998); Matter of Parental Rights as to Gonzales, 113 Nev. 324, 933 P.2d 198 (1997); Scalf v. State, Dep’t of Human Resources, 106 Nev. 756, 801 P.2d 1359 (1990); Kobinski v. State, 103 Nev. 293, 738 P.2d 895 (1987). Due process requires that clear and convincing evidence be established before terminating parental rights. See Cloninger v. Russell, 98 Nev. 597, 655 P.2d 528 (1982). This court will uphold termination orders based on substantial evidence, and will not substitute its own judgment for that of the district court. See Kobinski, 103 Nev. at 296, 738 P.2d at 897.

Grounds for termination of parental rights

NRS 128.105 sets forth the basic considerations relevant in determining whether to terminate parental rights: the best interests of the child and parental fault. In 1997, at the time of this proceeding, this statute provided as follows:
The primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination. An order of the court for termination of parental rights must be made in light of the considerations set forth in this section and NRS 128.106 to 128.109, inclusive, and based on evidence and include a finding that:
*796 1. The best interests of the child would be served by the termination of parental rights; and
2. The conduct of the parent or parents demonstrated at least one of the following:
(a) Abandonment of the child;
(b) Neglect of the child;
(c) Unfitness of the parent;
(d) Failure of parental adjustment;
(e) Risk of serious physical, mental or emotional injury to the child if he were returned to, or remains in, the home of his parent or parents;
(f) Only token efforts by the parent or parents:
(1) To support or communicate with the child;
(2) To prevent neglect of the child;
(3) To avoid being an unfit parent; or
(4) To eliminate the risk of serious physical, mental or emotional injury to the child; or
(g) With respect to termination of the parental rights of one parent, the abandonment by that parent.
Talia and Sam contend that the district court failed to apply the correct standard of law in denying their petition for termination of Raja and Hikmet’s parental rights. Specifically, Talia and Sam contend that the district court reached its decision by relying on the standard set forth in Champagne, which addressed NRS 128.105 as it was written in 1985. Talia and Sam insist that the district court is required to consider the best interests of the child in reaching its decision.
Nevada’s termination statute has changed significantly since its enactment in 1975. The earliest version of the statute did not expressly address the best interests of the child. Rather, the statute articulated specific grounds upon which termination could be granted: “A finding by the court of any of the following: (a) Abandonment of a child; (b) Neglect of a child; or (c) Unfitness of a parent, is sufficient ground for termination of parental rights.” 1975 Nev. Stat. ch. 549, § 10, at 964.
In 1981, the legislature amended the statutory provisions addressing the grounds for terminating parental rights. In particular, the legislature inserted an opening paragraph: “An order of the court for termination of parental rights may be made on the grounds that the termination is in the child’s best interest in light of the considerations set forth in this section and [NRS 128.106 to 128.108], inclusive.” 1981 Nev. Stat. ch. 718, § 19, at 1755 (emphasis added). The amendment expanded the grounds upon which termination could be granted to include (in addition to abandonment, neglect, and unfitness of the parent) risk of serious physical, mental or emotional injury to the child, and token efforts by the parent. Id.
*797 Following the 1981 amendments to NRS 128.105, this court in Champagne interpreted the statute and announced a two-step analysis to be applied when deciding whether to terminate parental rights. According to Champagne, the first step in the analysis requires that there be what the court characterized as “jurisdictional” grounds for termination. Id. at 640, 691 P.2d at 849. Jurisdictional grounds relate to “parental conduct or incapacity and the parent’s suitability as a parent.” Id. at 646, 691 P.2d at 854 (footnote omitted). In other words, jurisdictional grounds focus on parental fault or inability to act as a parent. If jurisdictional grounds for termination are not established, the inquiry ends. Id. at 647, 691 P.2d at 854. If jurisdictional grounds are established, the analysis turns to whether dispositional grounds exist for termination. Dispositional grounds relate to whether ‘ ‘the child’s interest would be served by termination.’ ’ Id. at 652, 691 P.2d at 857. The Champagne court explained that “[i]f under no reasonable circumstances the child’s best interest can be served by sustaining the parental tie, dispositional grounds for termination exist.” Id. at 652, 691 P.2d at 858.
As described, we used the term “jurisdictional” in Champagne to describe parental fault. The term jurisdictional, as used in this context, may have been misleading in that it suggests that the district court would be without subject matter jurisdiction to act on a termination petition absent a finding of parental fault. In fact, the district court always maintains subject matter jurisdiction over a properly filed petition to terminate parental rights. Despite the unfortunate choice of the word ‘ ‘jurisdictional,’ ’ Champagne actually held that relief prayed for in the petition, i.e., termination of parental rights, could not be granted unless parental fault was first established and a subsequent finding that termination would be in the child’s best interests was made.
Our holding in Champagne placed the main focus on the conduct of the parents. In 1987, the legislature responded to our decision in Champagne, and again amended the termination statute. The amended version provided in relevant part that “an order of the court for termination of parental rights must be made . . . with the initial and primary consideration being whether the best interests of the child would be served by the termination, but requiring a finding” of parental fault. 1987 Nev. Stat. ch. 116, § 1, at 210. The legislative history indicates that the legislature was concerned that the Champagne decision bifurcated the issues regarding children’s rights and parent’s rights in termination proceedings. See Hearing on A.B. 308 Before the Nevada Assembly Committee on Judiciary, 64th Leg. (Nev., March 20, 1987). During the hearings, Senator Sue Wagner, chairperson of the committee on the judiciary, stated that the purpose of the bill as *798 amended was to provide that parental rights and children’s rights were of equal importance in the termination of parental rights proceedings and must be considered together. Id.
Following the 1987 amendment to the termination statute, we acknowledged the statutory revision in Greeson v. Barnes, 111 Nev. 1198, 1200-01, 900 P.2d 943, 945 (1995), and concluded that jurisdictional grounds must still be established before terminating parental rights:
In Champagne, this court designated the considerations relating to the conduct of the parent as the “jurisdictional” ground, and the considerations relating to the child’s best interest as the “dispositional” ground. In 1989, [sic] in reaction to our decision in Champagne which seemed to accord primary emphasis to the rights of the parent over the rights of the child, the legislature added the following language to NRS 128.105: “with the initial and primary consideration being whether the best interests of the child would be served by the termination” (citation omitted). This amendment did not alter the requirement set out in NRS 128.105 and Champagne that at least one of the grounds alleging parental fault must be proven by clear and convincing evidence.
In affirming the district court’s order terminating the father’s parental rights, the Greeson court explained that under NRS 128.105 “a lower court may terminate a parent’s rights if it finds by clear and convincing evidence that the parent has abandoned the child and that terminating the parent’s rights is in the best interest of the child.” Id. at 1201, 900 P.2d at 945. The opinion concluded that the statutory amendment did not alter the Champagne analysis.
In 1995, the same year that Greeson was decided, the legislature once again amended NRS 128.105 by changing the introductory sentence as follows: “The primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination.” 1995 Nev. Stat., ch. 146, § 1, at 215. The following year, in Matter of Parental Rights of Montgomery, 112 Nev. 719, 917 P.2d 949 (1996), this court reversed a district court order terminating the mother’s parental rights on the basis that jurisdictional grounds for termination were not proved by clear and convincing evidence. In Montgomery, we began our analysis by setting forth the Champagne standard. Id. at 726, 917 P.2d at 955. Thereafter, we concluded that since the jurisdictional grounds were not supported by clear and convincing evidence, the district court erred in terminating the mother’s parental rights. Additionally, we determined that an analysis of the child’s best interests was not warranted:
*799 Because none of the jurisdictional findings were supported by clear and convincing evidence, we conclude that the district court erred in finding jurisdictional grounds for termination of Cherrel’s parental rights. Therefore, we need not address the district court’s findings with respect to dispositional grounds for termination.
Id. at 729-30, 917 P.2d at 956-57.
In 1997, in Matter of Parental Rights as to Gonzales, 113 Nev. 324, 334, 933 P.2d 198, 205 (1997), we noted that “[i]n 1995, the Nevada Legislature amended NRS 128.105 to state that ‘[t]he primary consideration in any proceeding to terminate parental rights must be whether the best interests of the child will be served by the termination.’ ” Despite our recognition of the legislative amendment, we analyzed the case under the Champagne framework.
Our adherence to the Champagne standard has resulted in the improper application of the termination statute. The amendments to NRS 128.105 demonstrate the legislature’s frustration with Champagne and its progeny, which place too much emphasis on the conduct of the parents instead of on the best interests of the child. Clearly, the legislative amendments of NRS 128.105 illustrate the legislature’s concern with protecting the best interests of the child.
“It is well settled in Nevada that words in a statute should be given their plain meaning unless this violates the spirit of the act.’ ’ McKay v. Bd. of Supervisors, 102 Nev. 644, 648 , 730 P.2d 438, 441 (1986). “ ‘[N]o part of a statute should be rendered nugatory, nor any language turned to mere surplusage, if such consequences can properly be avoided.’ ’ ’ Paramount Ins. v. Rayson & Smitley, 86 Nev. 644, 649, 472 P.2d 530, 533 (1970) (alteration in original) (quoting Torreyson v. Board of Examiners, 7 Nev. 19, 22 (1871)). Thus, “[w]here a statute is clear on its face, a court may not go beyond the language of the statute in determining the legislature’s intent.” McKay, 102 Nev. at 648, 730 P.2d at 441. Pursuant to the plain meaning of the termination statute, as amended in 1995, it is unmistakable that in all termination of parental rights proceedings, the best interests of the child must be the primary consideration. Moreover, the statute clearly provides that when deciding whether to terminate parental rights, the district court must always consider the best interests of the child in conjunction with a finding of parental fault.
Accordingly, we now abandon Champagne’s strict adherence to a finding of parental fault to terminate parental rights before the *800 district court considers the best interests of the child.[4] Application of the Champagne standard may have resulted in an artificial determination by the district court concerning parental fault, because such a determination cannot be made without considerations of how the parents’ conduct has impacted the child. The impact of parental conduct on the child is, in turn, one consideration in determining the best interests of the child. We will no longer require district courts, in the name of determining parental fault, to consider rigidly and formulaically the conduct of the parents in a vacuum, without considering the best interests of the child. Instead, in conformance with NRS 128.105, we adopt a best interests/parental fault standard for termination cases.[5] Accordingly, the district court in determining whether to terminate parental rights must consider both the best interests of the child and parental fault.
The termination statute sets forth factors to be considered in determining the best interests of the child. In particular, the statute provides that the “continuing needs of a child for proper physical, mental and emotional growth and development are the decisive considerations in proceedings for termination of parental rights.” NRS 128.005(2)(c). These factors allow the district court to consider the distinct facts of each case in deciding whether or not to terminate parental rights.
In Cooley v. State, Department of Human Resources, 113 Nev. 1191, 946 P.2d 155 (1997), this court addressed the best-interests-of-the-child standard. In Cooley, the mother was sixteen years old when' she gave birth to the child. Two years later, during termination proceedings, evidence was offered to show that the mother was raising that child in a home that was unsanitary and dangerous, that the mother had a bad temper, that the mother failed to complete two separate case plans, and that the mother exhibited no emotional connection with the child. Id. at 1192-96, 946 P.2d *801 at 155-58. The district court found that the mother’s conduct established abuse and neglect. Id. at 1196, 946 P.2d at 158. The district court concluded that termination was in the best interests of the child because the mother was incapable of caring for the child, lacked parenting skills and could not provide the child with a stable home. Id. The district court further noted that the mother was immature, selfish, and indifferent towards the child. Id. Finally, the district court observed that the child needed a parent immediately and that the child should not have to defer her needs until the mother decided that she wanted to be a parent. Id. Accordingly, in determining whether it was in the best interests of the child to terminate the mother’s parental rights, the district court considered that particular child’s physical, mental and emotional well being.[6]
In addition to considerations of the best interests of the child, the district court must find at least one of the enumerated factors for parental fault: abandonment of the child; neglect of the child; unfitness of the parent; failure of parental adjustment; risk of injury to the child if returned to, or if left remaining in, the home of the parents; and finally, only token efforts by the parents. See NRS 128.105(2)(a)-(f). Although the best interests of the child and parental fault are distinct considerations, the best interests of the child necessarily include considerations of parental fault and/or parental conduct. Accordingly, the best interests of the child and parental fault must both be shown by clear and convincing evidence. See Montgomery, 112 Nev. at 726, 917 P.2d at 955.
The purpose of Nevada’s termination statute is not to punish parents, but to protect the welfare of children. See NRS 128.005. The United States Supreme Court has decisively established that the parent-child relationship is a fundamental liberty interest. See, e.g., Lehr v. Robertson, 463 U.S. 248, 258 (1983) (maintaining that the relationship of love and duty in a family unit is a liberty interest entitled to constitutional protection); Santosky v. Kramer, 455 U.S. 745, 753 (1982) (noting that the fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents); Quilloin v. Walcott, 434 U.S. 246, 255 *802 (1978) (recognizing that the parent-child relationship is constitutionally protected); Stanley v. Illinois, 405 U.S. 645, 651 (1972) (stressing the importance of the family and the right to raise children); see also Francis Barry McCarthy, The Confused Constitutional Status and Meaning of Parental Rights, 22 Ga. L. Rev. 975 (1988) (examining the historical development of parents’ constitutional rights). While we recognize the importance of parents’ constitutional interest in maintaining a relationship with their children, we also recognize that as a society we have an interest in raising children in an environment that is not harmful to their welfare or best interests. See Mary S. Coleman, Standards for Termination of Parental Rights, 26 Wayne L. Rev. 315, 322 (1980) (examining the interests of parents and children in termination proceedings); see also Raymond C. O’Brien, An Analysis of Realistic Due Process Rights of Children Versus Parents, 26 Conn. L. Rev. 1209 (1994) (contending that application of preponderance of the evidence standard, as opposed to clear and convincing evidence, in termination cases would recognize both the parental presumption and the rights of the child). Accordingly, deciding whether to terminate parental rights requires weighing the interests of the children and the interests of the parents.
Numerous courts have recognized a best interests/parental fault standard in deciding whether to terminate parental rights. See, e.g., Egly v. Blackford County Dep’t of Pub. Welfare, 592 N.E.2d 1232 (Ind. 1992) (reviewing evidence of parents’ failure to meet responsibility as parents and best interests of the child); L.B.A. v. H.A., 731 S.W.2d 834 (Ky. Ct. App. 1987) (considering the rights of the natural mother and the best interests of child in termination proceedings); In re Christina H., 618 A.2d 228 (Me. 1992) (recognizing that best interests of the child inquiry is separate and distinct from parental fault inquiry); In re J.J.B., 390 N.W.2d 274 (Minn. 1986) (noting that in termination cases, balance between child’s best interest and parents’ interest is required); In re A.K.L. and A.M.L., 942 S.W.2d 953 (Mo. Ct. App. 1997) (recognizing the primary concern must be best interest of the child and parental fault); In re M.B., 386 N.W.2d 877 (Neb. 1986) (balancing best interests of child with parental fault in termination proceeding); In re Kristopher B., 486 A.2d 277 (N.H. 1984) (balancing best interests of the child with parental fault required in termination proceeding); Ward v. Commonwealth, 408 S.E.2d 921 (Va. Ct. App. 1991) (stating that termination of parental rights requires examination of best interests of the child and the likelihood of parental rehabilitation). These courts have acknowledged the importance of weighing the interests of the child and the interests of the parents in termination proceedings.
*803 In the present case, the district court did not consider the best interests of the child, because the court found that the jurisdictional grounds for termination were not proven by clear and convincing evidence. In light of the statutory amendments to the termination statute, we conclude that, upon remand, the district court must consider whether the best interests of the child would be served by the termination, coupled with considerations of whether parental fault exists.

Statutory presumption of abandonment

The district court did not apply the statutory presumption of abandonment contained in NRS 128.012(2) in considering whether Raja and Hikmet abandoned the child. NRS 128.012 defines “abandonment of a child” as follows:
1. “Abandonment of a child” means any conduct of one or both parents of a child which evinces a settled purpose on the part of one or both parents to forego all parental custody and relinquish all claims to the child.
2. If a parent or parents of a child leave the child in the care and custody of another without provision for his support and without communication for a period of 6 months, . . . the parent or parents are presumed to have intended to abandon the child.
NRS 128.090(2) provides in relevant part that the district court “shall in all cases require the petitioner to establish the facts by clear and convincing evidence and shall give full and careful consideration to all of the evidence presented.”
Talia and Sam introduced evidence that Raja and Hikmet had abandoned the child. The evidence showed that Raja and Hikmet left their child with Talia and Sam without any provision for support for over seven years. During that period, Raja saw the child only twice and Hikmet did not see the child at all. Talia and Sam also offered evidence that Raja and Hikmet spoke to the child on the telephone only once during this time.
As stated previously, the district court did not apply the statutory presumption of abandonment in considering whether Raja and Hikmet abandoned the child. Once Talia and Sam introduced evidence that Raja and Hikmet left the child for six months without communication or provisions for support, application of the statutory presumption of abandonment shifted the burden to Raja and Hikmet to prove that they did not abandon the child. See NRS 47.180(1) (providing that “[a] presumption, other than a presumption against the accused in a criminal action, imposes on the party against whom it is directed the burden of proving that the *804 nonexistence of the presumed fact is more probable than its existence”).
We conclude that the district court erred in failing to apply the statutory presumption. This court has previously acknowledged that the application of the statutory presumption of abandonment contained in NRS 128.012(2) is not discretionary. See Gonzales, 113 Nev. at 331 n.5, 933 P.2d at 202 n.5.

Exclusion of English translations of four Arabic letters

During the proceedings, Talia and Sam attempted to admit four Arabic letters written by Hikmet to Talia and Sam. Talia and Sam had the letters translated by a translator certified by the Eighth Judicial District Court. The translations were accompanied by a sworn affidavit of the translator. The significance of the letters, according to Talia and Sam, is that they rebut Raja and Hikmet’s assertions that they never intended the child to remain with Talia and Sam. Talia and Sam contend that this excluded evidence is manifestly important to their case and that the district court erred in excluding the letters.
The district court has considerable discretion in determining the admissibility of evidence and this court will not disturb a district court’s ruling absent an abuse of that discretion. See K-Mart Corporation v. Washington, 109 Nev. 1180, 866 P.2d 274 (1993). NRS 51.075 provides in relevant part that “[a] statement is not excluded by the hearsay rule if its nature and the special circumstances under which it was made offer assurances of accuracy not likely to be enhanced by calling the declarant as a witness.” We conclude that the district court abused its discretion in excluding the certified translations of the four Arabic letters written by Hikmet to Talia and Sam.

CONCLUSION

We conclude that a new trial is required in light of the legislative amendments to NRS 128.105, which require the district courts to give primary consideration to whether the child’s best interests will be served by the parental termination. We also conclude that a new trial is warranted because the district court failed to apply the statutory presumption of abandonment as codified in NRS 128.012(2), and erred in excluding the certified English translations of the four Arabic letters.
Accordingly, we reverse the order of the district court denying Talia and Sam’s petition to terminate the parental rights of Raja *805 and Hikmet as well as the district court’s order denying Talia and Sam’s motion for a new trial, and remand this matter for further proceedings consistent with this opinion.[7]
Rose, C. J., Young, Maupin, Shearing, Leavitt and Becker, JJ., concur.

At the time, Hikmet was a university professor and medical doctor in Baghdad.

The notarized adoption consent form indicates that Hikmet executed this document in the presence of Dolores Fox, a notary public, and in the presence of two independent witnesses. However, Dolores Fox admitted that Hikmet did not sign the adoption consent form in her presence and that her notarization was unlawful. Hikmet contended that he never signed this document.

The letter and will were never produced at the hearing.

To the extent that our case law follows the jurisdictional/dispositional analysis announced in Champagne, we overrule the following cases: Matter of Parental Rights as to Carrón, 114 Nev. 370, 956 P.2d 785 (1998); Matter of Parental Rights as to Daniels, 114 Nev. 81, 953 P.2d 1 (1998); Cooley v. State, Dep’t Hum. Res., 113 Nev. 1191, 946 P.2d 155 (1997); Matter of Parental Rights as to Gonzales, 113 Nev. 324, 933 P.2d 198 (1997); Matter of Parental Rights as to Bow, 113 Nev. 141, 930 P.2d 1128 (1997); Matter of Parental Rights of Weinper, 112 Nev. 710, 918 P.2d 325 (1996); Scalf v. State, Dep’t of Human Resources, 106 Nev. 756, 801 P.2d 1359 (1990); Smith v. Smith, 102 Nev. 263, 720 P.2d 1219 (1986); Daly v. Daly, 102 Nev. 66, 715 P.2d 56 (1986); McGuire v. Welfare Division, 101 Nev. 179, 697 P.2d 479 (1985).

In light of this new standard, we will no longer refer to the terms ‘ ‘jurisdictional” and “dispositional” to describe the judicial findings that must be made in termination cases.

We note that the results of this case may have been different had the child been older and had different needs. A child’s needs necessarily affect the impact of parental conduct.

In light of our disposition, we need not address the other contention raised on appeal: whether newly discovered evidence warrants a new trial or new and additional testimony.